The second case is Larry Coleman, Chester Coleman v. Morris-Shea Bridge Company and Richard Shea, No. 21-13764 and 22-10239. We again have several people arguing. If I, again, mispronounce names, please correct me when you get to the podium. Mr. Garrier, you have 12 minutes with two remaining on rebuttal. Great. Thank you. My name is Charles Garrier, and I represent Larry Coleman in this multi-issue consolidated appeal. Let me start by saying that we do have one of the appeals that relates to the issue of costs, and we believe that our briefs pretty much adequately address the issue that we have there, that we believe the district court abused its discretion by awarding items of costs that do not fit within the strict language of the statute authorizing costs under 1920 print 2. We rarely disturb a district court's award of costs. How can you argue that the district court clearly abused its discretion here when we have prior precedent that allows a district court to tax costs for fees associated with depositions? The court can certainly tax costs, but they may not exceed the statute and the items that are identified in the statute. And as we point out in our brief, the statute was amended, particularly this section was amended in 2008 to remove the language that says fees of the court reporter to now just say fees of transcripts necessarily obtained for use in the case. And by removing fees of the court reporter, I think the judicial conference who recommended that change and Congress who passed it said, fees now, which is like handling exhibits and doing paralegal work that court reporters are now charging, are outside the cost statute. They can be awarded as attorney's fees, as I believe this court has held. Those are expenses you can recover as fees, but it's an abuse of discretion. to award anything beyond the scope of the statute. And just to clarify, the fees you're challenging are less than $2,000? Yes, they're less than $2,000. And we do think it's important because it does take the district court time to deal with these fee issues. And we believe that clarifying the statute could make the task of the clerk a little bit easier and billing tasks and excluding and including and save time for the litigants. And we should probably move to the merits. Pardon me? We should probably move to the merits. Yes. And I'd like to focus. Larry Cohen contends that the district court erred in granting summary judgment on his age claims and his race, termination, and wage claims. Can I ask you a question out of the gate about the judicial estoppel issue? As everybody is well aware here, the district court applied judicial estoppel due to the appellant's testimony at trial being quite contradictory to their deposition testimony and declarations. Do you agree it was contradictory? No, it was not contradictory. So both Larry and Chester were adamant during discovery that Larry was a supervisor but then switched factual positions at trial. Was Larry a supervisor or not? Larry at times would supervise. He was sometimes the superintendent. The two-year period prior to his case that went to trial, which was an FLSA case, from April of 2016, from April of 2017, the admission of defendants is he was working as a laborer. So he was not working as a supervisor other than being a foreman. Yes, but counsel, as you know, the relevant time frame was 2015 to 2017. That's outside of the work that was being done at the Mountain Brook Lake House and at the other owner's facility. So let's talk about that because his testimony, as Judge Branch mentioned, the testimony in deposition and in affidavit was that after he was rehired in the end of 2014, he either supervised or was a foreman and did supervisor-like things and then disclaimed that not just in 2016 and 2017 but for the entire statute of limitations period in the FLSA. No, I believe he did not disclaim the entire period because he said when he came back in 2014, he was a superintendent on a job when Mr. Duberley left that job and also that he was called a working foreman. Did he testify that in 2015 he had no title with the company? The company, the titles varied. He had no formal title. Please answer my question. Did he not testify that in 2015 he had no title with the company? I believe he said that. And did he not testify that he couldn't hire or fire from 2015 to 2017? That's what he testified. Right. That was contrary to his affidavit, was it not? His affidavit said that there were periods of time where he could hire and fire and indeed The relevant time period we're talking about, right? Well, his Title VII claim that was at issue in the summary judgment would meet a much broader scope than his FLSA claim. He filed his complaint in 2016. that when I was hired back in 2014, I was hired back as a superintendent. That's at his deposition, Docket Entry 76-7 at 309-10. That's what he said and indeed he was. How's that not contradictory to I didn't have a position with the company in 2015? Because in 2015, he's doing something totally different. He's now not a superintendent. He's a foreman. They testify him as a foreman. Not a supervisor is what Mr. Shea testified to. And he considered himself a supervisor. I have no doubt that you have explanations for a lot of these things. But I guess the question is, was it clearly erroneous for a district judge hearing the deposition and affidavit testimony, writing a comprehensive summary judgment order, and then sitting in that same trial and hearing what he perceived to be very different, could a judge not reasonably perceive that those things were contradictory? I have to tell you that they appear that way to me. We believe it was clearly erroneous because he conflated testimony about various periods of time to look at, say, his testimony at the trial where he was focusing on a very definite period of time where his duties changed. And the theory of that case was under Morgan v. Family Dollar. You can have a title, but there are times where you could be not exempt or times when you are exempt. And the titles are meaningless. The question is, what are the jobs he's doing? And there was no debate from the defendant that he was doing labor work from April of 2016 to 2017. Can we talk about the discrimination claims? Sure, certainly. I want to talk about discrimination claims. So let's put aside prima facie case for a moment. Okay. Why was the company, why during litigation did the company claim that Larry was fired? Well, one, they first claimed he wasn't fired. That he was no longer working with the company. Well, they sent him home because he was riding with his brothers who were allegedly late returning. What was the legitimate business, the nondiscriminatory reason that they gave for why Larry was no longer working with the company? Well, when he filed for unemployment, they said he was laid off. I'm asking you what they said in litigation. In litigation, they said, well, they didn't articulate one as to Larry because they said they were late coming back from lunch. Then they said there was a work ethic. Counsel, I want to look at the deposition of Mr. Shea, Jr. So he was asked, why did you send them home? Because they weren't doing their job. And what did, and did you personally observe issues with them not doing their job? Yes, I did. Well, which is the they. What the defendants did is they used they. If you'd like, I don't want to have to read the whole thing since you took the deposition. But three questions before that, it's why are Larry, Chester, and Freddie no longer working at Moorish J. So they refers to all of them. So that's a conclusory statement. Well, when you go down to it, the claim was Chester and Freddie were late returning from lunch. What wasn't the legitimate non-discriminatory reason they gave? I'm not talking about whether it's true. Yeah. Well, wasn't counsel. Yeah. Listen to me. Wasn't the legitimate non-discriminatory reason they gave that the work product of the three brothers was significantly diminished from what it had been in earlier projects? And that is why they were sent home. I think he said it was their work ethic. They weren't working as hard as they had. Okay. So I'll get to the truth of that in a second. That was the legitimate non-discriminatory reason that was given in litigation. Right. Okay. Why? What evidence was there? More importantly, what have you argued to us in brief about why that was pretext? Well, there's no indication anywhere as to what Larry's work product was deficient on. Just saying work product is how can we show it's a pretext with their specifics? You're attacking the truth of that statement, but that truth stands for itself. What contradictory evidence did you present at summary judgment to that? The problem with it is that articulation doesn't meet the legal standard for articulating a reason that is subject to being challenged. Saying I don't like your work ethic, how do I challenge that? What does it mean? That seems objective to me. Well, what does it mean not doing your job? Counsel, so the answer is you have nothing that contradicted that. It can't be contradicted. It's not an appropriate articulation. I just want to be clear. So the issue that we have to decide is if this court finds that that is a legitimate nondiscriminatory business reason, there was no evidence contradicting that. Correct? There's evidence that if his work wasn't good, he was working there doing the same thing from April of 2016 to April of 2017. He's not told your work ethic is bad for that entire year. He's kept there. They're still paying him a higher rate of pay. The warning, didn't Larry testify that there was a warning made? At some point, there was a warning. It doesn't say when. Some warning. And they're still paying him twice or three times what they could have paid a laborer to do that work. So if his work ethic is bad, why are they keeping him there and paying him $25, $30 an hour when they can get laborers? Didn't they testify exactly why that was going on? Isn't the record undisputed as to why that happened? He says he kept them there for some reason because he wanted to keep them there. He thought he had good employees and to take care of his employees so they don't go work for another company, he paid them at their standard rate, not the day laborer rate, until a new paying job came up. Wasn't that the testimony? He said that. Right. Didn't he dispute that testimony? No. Right. So I go back. What evidence was there to dispute the legitimate, non-discriminatory reason that their work ethic and they weren't doing their job during the time that they were let go? No. Mr. Doberle has never testified who was the superintendent. The work wasn't getting done. There's no indication as to what work's not getting done. I understand there's an absence of evidence. I'm asking you something different than that. What evidence contradicted that? Well, that goes to the ultimate issue of articulating a legitimate, non-discriminatory reason. If it's just a conclusory statement, it by definition can't be attacked and it's insufficient. Thank you. Ms. Leonard, you have six minutes and you've saved two for rebuttal. Thank you, Your Honors. May it please the Court. My name is Heather Newsom Leonard, and I will be arguing today on behalf of Appellant Chester Coleman. The issue that's unique to his appeal is what appears to be an issue of first impression to this Court, which is does the doctrine of judicial estoppel apply to a witness? Do we have to get there if we affirm the claim? I think Chester only brought his – Termination. His termination claim, race and age discrimination termination claims. Correct, Your Honor. The only issue that we appealed substantively would be his termination claims under the ADEA, Title VII, Section 1981. And your question is one that I wrangled with, which is, you know, which should come first here, the estoppel analysis or the termination analysis? Well, I'll tell you what the appellate judge answer is, and that's the easiest one to decide, right? Well, and I'm not really sure which one of those it is, Your Honor. I'll tell you this, when my ears hear first impression, my eyes generally go to the other issue. Well, and I get exactly where you're coming from. I think the estoppel issue is one of a little more importance for this Court to answer simply because I think it's something that can happen again. And the absolute lack of direction. Have you ever seen this before? Pardon? Have you ever seen this before? I've seen where it could have happened. This is the first time it's happened. I've never seen it before. So I just, if it was a repeat thing, I understand. But let me have you focus for the moment, just to benefit me, on the Title VII and ADA discrimination claim. Absolutely. You're making my job easier because that way I know where to focus where you want me to go. Thank you. I'm going to jump in on the question that you asked, Mr. Greer, which is what evidence will we have of pretext? Because I think that the district court erred on the prima facie analysis. There's a disputed issue as to who replaced Chester. So that's why I got to where I did with Mr. Greer. Let me say that I agree with you on that. Okay. That's why my first question to him was put aside prima facie case were there. Then the next step, as you know, is legitimate non-discriminatory reason and whether that reason is pretext. So I'm going to agree with you for the moment that there's a prima facie case problem. And the argument that I feel is strongest for Chester Coleman on the issue of pretext hinges on this court's most recent analysis in Patterson v. Georgia-Pacific, which pulls the long line of sometimes followed, sometimes not followed analysis of is a failure to follow a progressive discipline policy evidence of pretext. Haven't we said, though, let's assume that you're right on that. Yeah. Haven't we said that that alone isn't sufficient to overcome a legitimate non-discriminatory reason? Again, it depends on the circumstances and the facts of the case. And I think that's the problem with a lot of the Title VII cases is these general rules get developed through more or less dicta in certain opinions when the courts then feel that they're obligated to follow that rather than looking at the specific facts of the case. What we see here is that the disciplinary policy in the handbook that was provided to Mr. Coleman reads as follows. And I'm sorry to interrupt you. I just want to read from Springer, for example. This is the case I'm talking about. The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest the employer was motivated by illegal discriminatory intent or that the subjective reasons given by the employer for its employment decision were pretextual. And that's not the only reason that's here, Your Honor, but sometimes it can be. And that's where I'm saying is these cases are factual and require us to dig into the facts. Well, and then also we have Morrison v. Booth that does say failure to follow such a policy could lead to evidence of discrimination. But Morrison found such inference when the employer was willing to break the rules for another white employee. But haven't you presented no evidence that the company failed to follow their discipline policy for a white employee? Your Honor, those are two different issues. The reason that we point to the policies, and it's more consistent with what we see in the Patterson case, is because the policies create an expectation of what type of evidence we would see if this was truly the motivating reason. When we look at docket entry 100-4, pages 41 through 42, which are the disciplinary policy in the Morris-Shabridge handbook, emphasize and underline in the handbook it says that the official document to be used in this procedure, the disciplinary procedure, is a written reprimand from the immediate supervisor of the violator of safe work product practices or unsatisfactory performance. What we have here is Morris-Shabridge says we let Chester go because we believed he had a period of poor performance and poor attendance. The handbook creates the expectation that if that is true, we would see written disciplinary actions in his performance file showing that. The absence of that documentation, which we would expect through its policy, becomes the evidence of pretext from which the jury could find the only evidence of pretext. No, Your Honor. The other evidence we have of pretext is the disputed denial. We have evidence that Mr. Coleman was not late on the name questions. Okay. But that doesn't seem to directly rebut, though, what I think is the legitimate nondiscriminatory reason that they gave. In other words, the way you all frame it in the briefs is it was about the lunch. He didn't come back from the lunch that last time, and they fired him. And your point is he testified, no, I wasn't late, and that's a dispute. But it seems to be that it's not just the lunch, that it was part of a larger, and I think you described it earlier, a part of a larger performance issue. And if that's the case, then the dispute about the lunch becomes a lot less relevant for pretext, it seems to me. And I hear what you're saying, Your Honor, if you can bear with me for a second. I am answering your question. It just may take me going around the barn to get there. This is part of the problem, not just in this case but in other employment cases, where you have a reason that's given to them when they are let go. Then it's not clear. For a while, Morrissey Bridge says we didn't even fire him, that we just sent him home to think about it, and then they never come back. The issue that's framed as a legitimate, nondiscriminatory reason at summary judgment often is not consistent with what we've seen evolving through the evidence. It's the reason that the defendant has chosen to argue in moving for summary judgment. And what we see here is evidence, first, that Morrissey Bridge says we didn't fire him, we just sent him home to think about it, and then never call him back. But yet we have email evidence within a week of their termination saying, are they still terminated? And the only reason that they are given at the time of their termination is because you came back from lunch. When we start having all of these questions about – All right. You've exceeded your time, but you have saved some time for rebuttal. Thank you, Your Honor. And, again, I'm sorry if I didn't get to your question. Thank you. Ms. Wallace, you have six minutes and you've also saved two for rebuttal. Good morning, Your Honors, and may it please the Court. I represent Freddie Seltzer, who has two claims, claims of race discrimination related to pay and termination. I would like to address the Court's question about termination and pretext. There's a lot more evidence in the record that shows pretext. Number one, Dick Shea testified he didn't fire them. He was the one present on the job site the day that they were fired. And he testified, I didn't fire them. I didn't tell Mr. Dubberley to fire them. I didn't have anything to do with it. Dubberley testified, oh, no, Dick Shea told me to fire them. Richard Shea was not there, was not participating in these decisions. It was Dick Shea who was present at the work site. And he's changed his position with regard to whether or not he made any decision to fire them. There's an email saying Dick Shea says fire them and they can never work here again. Pretext, whether they were fired or let go or terminated or who actually did it doesn't seem to go to pretext, does it? I think it goes to the point of whether or not they were fired because they weren't doing their job or there was some issue with their performance. When Dick Shea testifies under oath, I didn't tell anybody to fire them. I didn't make that decision. I didn't tell Dubberley to fire them. And didn't Harris also testify that he noticed a significant decline in work ethic with regard to the three brothers? He did. It seemed to be a uniform understanding that that's why that whatever came to head came to head. Harris didn't show up on that particular job site until later. He was not there day in and day out with them. So I think it's very important that Dick Shea, under oath, and the truth comes out when people are under oath, said I did not fire them. Again, just back to Judge Luck's question, I'm not following the connection between he's saying I fired him and then he's denying that he fired him. We all agree he was fired. How does that go to pretext? Can you make that connection? Certainly, Your Honor. If Marcia is going to make the argument that the decision was made because they weren't doing their job, the people on the job site that day were Dubberley and Dick Shea and these three gentlemen. And Dick Shea would have been the only one to have said, oh, I think they're not doing their job. I think there's an issue with their performance. And he would have been the one to – It was sort of the straw that broke the camel's back. I mean, he thinks they come home, they're coming back late from lunch, but there's this decline in work ethic that led up to that when he sent them home. Well, if they had said anything to them about it, but nothing was ever said to these three gentlemen, certainly Freddie Seltzer, about any issues with his performance. That doesn't seem right. Larry was told, because he was sort of the leader, that, hey, you've got to – I think tighten up was the word that was used in the record. You have to tighten up and communicate that to your brothers. It was not out of the blue that there was frustration with the brothers. But Freddie testified there was no need for me to tighten up. I was doing my job. I wasn't late. I was coming in. In fact, they were early on this particular day to work. They were doing their job. Mr. Seltzer was a welder-apprentice, a pile driver, a certified welder, a load operator, a front-end loader, a forklift operator, a skid-steer operator. He drove the rock truck, the water truck. He ran the excavator, the man lift. And Dick Shea said he was a crane operator. But he was never classified as a crane operator, which pays more than Operator C, the classification that was given to us in that spreadsheet. And Dick Shea testified, I don't know where that spreadsheet came from. I've never seen it. I don't know why he's classified as an Operator C. Most of the time, he is a crane operator. So the position of Morris Shea tended to change depending on what was being asked and what arguments were being made. But it's very clear that Freddy Seltzer was a good employee. He volunteered for the majority of these jobs. He never got classified for any of these jobs. He didn't get the pay that others got for crane operator. But it's real clear that Dick Shea understood most of the time he was a crane operator. So I think the issue with Mr. Seltzer slacking and not doing his job, I think we've shown pretext with the fact that Mr. Seltzer did his job. He volunteered for everything. He was an excellent employee. So I think that helps rebut that. I had one other point on termination. Mr. Shea, Dick Shea, said that Mr. Dubberley would have had to have been the one to have fired him. It was Mr. Dubberley's decision, but he never told Dubberley to fire them. If Dubberley's the decision-maker, then the decision-maker called Freddy Seltzer, in 2015, a black ass. And that would show racial intent or some bias on the part of Mr. Dubberley. And Dick Shea's made it very clear he has washed his hands of the decision to take any adverse action against Freddy Seltzer. He has put it on Mr. Dubberley. And Mr. Dubberley has made racist comments. There are others, Mr. Coleman, who said that he heard Mr. Dubberley on many occasions call African-American employees boy. So when you look at the totality of what was going on, these gentlemen were working, picking up sticks and rocks. Your time has been exceeded, but you have two minutes on rebuttal. Thank you, Your Honor. Thank you. And I don't want to mess up your last name, I feel certain. Ms. Vague, or Vague-U, and you have 30 minutes. Vague is correct, and the first name is Ami. Thank you, Your Honor. Can I ask you a question about judicial estoppel just right out of the gate? Yes, Your Honor. So can you provide a single instance of a court of appeals upholding a decision of a district court who invoked judicial estoppel to retroactively apply to claims already disposed of on summary judgment? In what appears to be an appeal, an effort to preclude an appeal on the merits? Your Honor, I can't point to a case that's directly on point as this. As Judge Luck pointed out during the appellant's argument, this is sort of a novel issue. It doesn't arise a lot. So typically a judicial estoppel situation is somebody will take a position, and then the second position contradicts the first, and so judicial estoppel may be imposed to prevent the taking of the second contradictory position. But here, when the trial was going forward and the contradictory testimony was occurring, there was no estoppel imposed on that trial. Rather, the district court turned around and revised a past decision. That's correct, although that past decision was still interlocutory at the time. And given the stage of the case where we were in the case with summary judgment already being entered, Judge Kugler's remedies were somewhat limited, his options rather. And I think as he pointed out in his order, what he was concerned about in particular is that perhaps if this court for some reason were to reverse the summary judgment order, would the appellants then be in the position of coming back into his courtroom and switching positions again? So I think he was trying to fashion a remedy that would address that very concern. He was certainly very frustrated. I see that, but I will also tell you I have been unable to find a case where the estoppel was invoked on the taking of the first position rather than the second. And I understand the concern there, Your Honor, that this is sort of a unique issue. And this kind of touches on something that Judge Luck also pointed out during the appellant's position and something I wanted to point out for this court at the outset, which is there are two primary issues before this court. First, whether the district court properly granted summary judgment. And second, whether the court abused its discretion in applying judicial estoppel. But importantly, these are different issues and different bases upon which the district court can be affirmed. So if, for example, this court affirmed the district court's summary judgment order, it wouldn't need to reach the judicial estoppel order. There is a third issue before this court on the bill of costs, and like the appellants, we believe that's sufficiently addressed. Could I dive into the discrimination claims? So on the Prima Fischa case, as I understand the undisputed evidence, and correct me if I'm wrong, with regard to termination, not compensation, with regard to termination, the comparators are not the folks who worked for Mr. Hughes, who were sort of specialty laborers, but three other individuals, one African-American and two white, who were replaced as manual laborers, the three brothers. Is that correct? Yes, Your Honor. Why is that not a sufficient comparator where two of the folks of the three that were replaced were white, and we have no indication of who was replacing who? In other words, like who was replacing Larry because they, like Larry, had had a ton of experience and were kind of a former supervisor, and those who were like the brothers who were more sort of worker bees? Your Honor, our position is that because one of those individuals was a black individual, as you point out, it undercuts this idea that race was the reason for the termination. Well, that may be right in terms of the evidentiary value of it, but I don't see how that doesn't meet the Prima Fischa case. In other words, it seems to me you can't just say, well, we hired one African-American out of three, and so there's no comparator here, which seems to be what the district court ruled and what you advocated both there and here. That doesn't seem to be right to me. That is— But it may be right when we then use that at the pretext stage to say the inference is really weak because, in fact, at least one of the positions was replaced by someone of the same race. Yes, Your Honor, that is our position. That was the position of the district court, but you're exactly right. Even if this court finds that to be not persuasive, that only moves us to the second step of the analysis, which is the pretext analysis. Okay, so let's get there. So what evidence was presented by your opposing counsel that disputed—well, let me ask you this. So, first, what was the legitimate nondiscriminatory reason that you gave during litigation for why the brothers were, in fact, fired? Judge Luck, as you pointed out, the nondiscriminatory reason was this increasing decline in work ethic, showing up late to the job site, not doing their job, as Mr. Shea observed. Okay, so two questions regarding that. Is there any evidence to suggest that is not the same reason that was given at the time they were let go? No, Your Honor. There's no conflict between the reason that was given at the time that they were let go, and although appellants dance around it, each of the three plaintiffs acknowledged in their depositions. Now, they disagreed with it, but they acknowledged that Dick Shea at least believed that they were late returning from lunch, and there's additional evidence that Larry had been told they needed to tighten up those lunch breaks. Well, that gets to lunch, but I'm talking about were they told they were fired because they came back late from lunch that last day, or were they told they were let go or not being sent home or whatever because of a general decline in work from, you know, beginning of job or middle of job to end of job? On that particular day, Your Honor, they were told that they were being sent home because they took too long for lunch. Is that not inconsistent, a piece of evidence that shows an inconsistency that we could use for pretext? No, Your Honor, because when this Court talks about shifting reasons, and in fact, Your Honor, you addressed this very issue in a case recently, Thomas v. DeKalb County. It's looking for inconsistency. So when a defendant, for example, provides additional reasons on top of the original reason that was given and there's no inconsistency, that's not a shifting reason that would support pretext. All right. So the second issue is your opposing counsel, Mr. Greer, said to us was that's not – that's sort of too vague to be a legitimate non-discriminatory reason. You can't use that just a general decline in work ethic. Why is that right or not right, and what law can you cite as to suggest that what you told us was a sufficient legitimate non-discriminatory reason? That's incorrect, Your Honor. As this Court has repeatedly held, Eleventh Circuit case law is consistent on this point that an employer can fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all. It's not required that the employer articulate some reason that would be compelling to the employee or to anyone else. And, in fact, this Court has cautioned that federal courts are not supposed to act as super-personnel departments, coming in and second-guessing whether it was a good decision, whether it was a sound business decision. Instead, the inquiry of this Court is limited to whether that was a decision that might motivate a reasonable employer and whether the reason that was given was not just a questionable one but was false. Was the reason given false? And there's been no evidence to establish that the reason given by Morris Shea was false. All right. So Chester argues that there is some pretext evidence here because who was doing the firing was sort of unclear. The reason given was sort of unclear. And the person who would supposedly have done it sort of didn't give a real reason for why. Is it Adderley or Rudley? Mr. Dubberley. Mr. Dubberley. Dubberley. That Mr. Dubberley didn't really give the same reason that Mr. Shea and others gave. Well, I do want to clarify one point that I believe was slightly misstated by the appellants, which is Mr. Shea testified in his deposition that he, in fact, is the one who made the decision, that he sent the plaintiffs home. Now, there was some question of whether he intended to terminate them or not. And I think as this Court has recognized, that's not really dispositive of the issue of pretext. But he is the one who made the decision, and he's maintained all along that he did so because they took too long for lunch. And as Judge Berger pointed out, it was sort of the straw that broke the camel's back. And then Freddie argues to us, and I'm using the first names just to distinguish between brother to brother, right? Yes, Your Honor. It's consistent with how everybody argued the case, both below and here. Argued to us that there was some other issues regarding, we'll get to the compensation claim in a minute, but at the very least, classification issues regarding Freddie, and specifically racial slurs that were both directed at him and tolerated generally. Yes, Your Honor. That's pretext. The District Court looked at those very issues, and looking at Eleventh Circuit case law on that issue, noted that stray remarks here and there that are not connected in time to the issue, to the termination issue, are not sufficient to show a convincing mosaic of showing intent to discriminate. And so our position, as well as the District Court below's position, was that that wasn't sufficient to meet their burden to show pretext. Haven't we said, though, that the use of racial slurs with other evidence could be sufficient to show at least a convincing mosaic? If there was other evidence, Your Honor, yes. But a stray remark decades in the past, unconnected to any other evidence to show that there was an intent to discriminate, is not sufficient to meet this Court's standard. It seemed to me that there was evidence that Mr. — is it Dubberley? Mr. Dubberley did have — did use it more than just a stray time, at least when he was on the job. There was testimony from the plaintiffs indicating — That's good enough. Yes, Your Honor, that's true — indicating that he did use it with some occasion, but there wasn't testimony showing that it was consistent, that it happened on every job site, or that it had any connection to the decision-maker, Mr. Shea, on the job site in question. Well, let me ask you about the compensation claim then. So with regard to Freddie's compensation claim, we didn't quite get to it specifically, but I want to talk about comparators to him. What comparators were alleged to have been — did the plaintiffs allege were comparators to him in terms of his compensation that was different from somebody else? With respect to Freddie, they identified a number of purported comparators. Only one of those individuals, Mr. Sullivan, held the same job title with Freddie. But Mr. Sullivan was paid more, at least according to that spreadsheet, right? That is correct that he was. But a few points in response, Your Honor. First, on the comparator analysis this Court held in Lewis v. City of Union City, Georgia, that the comparator analysis, which must be performed in the prima facie stage, meaning it's plaintiff's burden to establish these things, must be similar in all material respects. That analysis, the Court said, doesn't turn on formal labels or job titles, but rather on substantive likeness. So it's not enough for a plaintiff to say, I held the same job title as another individual and I didn't receive the same pay. Instead, they have to go a step further and show evidence that would connect their comparator in material respects to them. And that's where all of the plaintiffs, Freddie included, fall short. They provided no analysis in the Court below to show that these were proper comparators, and they provided no analysis for this Court here to show that they were proper comparators. We don't have any indication of the licensure, skill level, or employment history of Mr. Sullivan, right? That's correct. There's nothing in the evidence to show that. That's plaintiff's burden. Their failure to provide that sort of comparison fails to get their claims past the prima facie stage. The same is true for Larry and Chester as well, and Judge Luck. I'm using their first names as well. I intend no disrespect, but just to distinguish between the plaintiffs. Larry identified a number of purported comparators. He likewise provides no analysis whatsoever to show that those individuals were similar in all material respects. And, in fact, they weren't. It's not defendant's burden to disprove it, but we did put forth evidence in the record to show that the individuals he identified worked on the drilling side. So if we could talk about the cost issue for a second. So I think we're whittled down now to a very narrow argument, which is just the court reporter fees. That's what we're talking about now, right? Yes, Your Honor. The deposition fees. The deposition fees. The cost of the court reporter to take the deposition. And your opposing counsel says that in 2008, the court, in formulating rules, removed that as part of the rule that attaches costs, and the indication there being that, given how things are done now, that that shouldn't be part of the transcription cost because it's separate and apart from that, and that could be assessed at attorney's fees or some other stage of litigation. How do you address that, and why is there not some intuitive logic to that argument? Your Honor, two points in response. First, the plaintiffs in their briefing cite to cases that hold, as they would hope this court holds, that those costs are not appropriate. But as we pointed out in our briefing, there are ample courts who've held just the opposite, that these fees are appropriate and are within the context of the statute. And as plaintiffs pointed out in their argument, the language of the statute says it's for fees for transcripts necessarily obtained. That necessarily obtained is viewed at the time that the fees are incurred, so at the time that we would have ordered those transcripts. And numerous courts have found that— When we're talking about the transcripts, we're talking about the cost for the court reporter. I think we agree that you're entitled to getting a copy of the transcript for a deposition of a witness that they listed. I think our EEOC case is clearly on point with regard to that. The question is simply the separate cost of paying the court reporter. Is that within both the statute and the rule, and should we read it differently than maybe we've read it in prior cases? I don't think that it should be read differently, and I do think it's contemplated within the context of the rule. And there's really three separate items of cost that they challenged. First is condensed depot transcripts. Second are the deposition exhibits. And then the third is just the expedited transcript for one single deposition. And each of those were necessary to defendants in our perspective at the time that we ordered them. The condensed deposition transcripts, for example, the district court below requires that entire deposition transcripts be submitted with a summary judgment argument. These deposition transcripts, in this case in particular, spanned hundreds of pages. Mr. Shea's deposition, for example, was 600 pages long. So it made sense to us and was necessary in our view to order these condensed transcripts. With respect to the deposition exhibits, as this court knows, it can be very difficult to read a deposition that is citing and referencing depositions without referencing exhibits, without those exhibits available to look at. So, again, at the time we ordered those, we believed it was necessary and that we would need them for use at summary judgment at trial. And then the third issue relates to just one expedited transcript which we ordered. That was the deposition of Chris Hughes. His deposition was requested by the plaintiffs in response to our summary judgment briefing and we had just two weeks before our reply brief was due. So, again, at the time we incurred that expense, we understood that it was necessary and we would need it to file our reply brief. We believe because of those reasons that it does fall within the statute. And I want to point out as well, as this court acknowledged, this is an abuse of discretion standard. Did the district court below abuse its discretion in awarding these costs? And our position is no. The plaintiffs haven't shown that there was an abuse of discretion. Other courts have held that these costs are appropriate and we believe that the district court should be affirmed on that point. If there's no further questions about the costs, I'll return back to the discrimination claims. Speaking just briefly on the compensation point further, as we've pointed out, we do not believe that the plaintiffs have established proper comparators for any of the three, which is an essential element of their prima facie case. Even if they had, however, that again just moves us to the second step of the analysis, which is the pretext analysis. And Morris Shea provided a number of reasons for pay differences in these individuals, including job location, job type, that is, whether it was a drilling job versus a pile driving job, licenses and certifications for the individuals, and employment history. Plaintiffs have not shown any evidence to suggest that these stated reasons for differences in pay were a pretext. And so even moving past that prima facie stage, our position would be that the district court should be affirmed on the pretext analysis. That turns us to the termination claim as well. We've already discussed the race termination claim. Even assuming they make it past that prima facie stage, we believe that their claims do fail at the pretext stage because Morris Shea provided a legitimate non-discriminatory reason for the terminations and plaintiffs have failed to produce any evidence to rebut that, which again is part of their burden. What about their argument that the progressive discipline in the policy was not followed and that that's their response? Your Honor, 11th Circuit case law on that point, as this panel pointed out during the appellant's argument, doesn't look just to whether a disciplinary policy was followed, but rather the relevant question is whether it was applied differently to individuals outside of the plaintiff's protected class. And that's what's missing here. Again, this court doesn't sit as a super-personnel department to decide whether Morris Shea's decision to follow or not follow its policies was a good business decision. It's trying to determine whether the stated reason was a pretext. In other words, whether the stated reason was false. Plaintiff's inability to put forth any evidence to show that that policy was applied differently to any other individuals outside of their protected class fails to show that there was pretext here. There is one other discrimination claim with respect to age discrimination that was raised only by Larry and Chester, and it fails for similar reasons. Even assuming, as the District Court did, the District Court found that the plaintiffs had established a prima facie case of age discrimination, but found that they again failed to rebut Morris Shea's stated non-discriminatory reason for its employment decisions. In the court below, the plaintiffs offered no new analysis on that point. They simply pointed the District Court to their analysis on the race termination claims, and the District Court found, once again, correctly that that was insufficient to show pretext. And so our position is that the District Court should be affirmed on that ground as well. Your Honor, I want to spend a little bit more time on the judicial estoppel issue, particularly if the Court has questions unless there are further questions on the discriminatory claims. Thank you, Your Honors. Again, at the outset, as I said, the Court need not reach this issue if it affirms the District Court on the summary judgment issues, but we do believe that the District Court should be affirmed on judicial estoppel because it did not abuse its considerable discretion in applying judicial estoppel in this case. It applied the correct legal standard, and it considered the totality of the facts and circumstances in this case before rendering its decision. Plaintiffs spend little time, both in their briefs and in their arguments to this Court, addressing that abuse of discretion standard. What's the point at which an inconsistent prior statement ripens into judicial estoppel such that the whole case is now shut down and you can't bring your claim? That's a question, Your Honor, that's best directed for the District Court because it is an abuse of discretion standard. Oh, I think that's directed at us. I mean, at some point, the abuse of discretion standard doesn't mean the District Court can do whatever it wants. There has to be a line, and then there's a reasonable sort of range within that line. And my question to you is directed at that line. I mean, in other words, you know, people give false testimony all the time, and the way you handle it is when you get to trial, you show them the deposition transcript or the document where they said something differently, and you have your Perry Mason moment in front of the jury, and the person looks not credible. And, by the way, that's exactly what happened here. You won. So at what point does that aha moment turn into, no, no, no, we're shutting this whole thing down. It is so irreparably inconsistent and wrong that you now are precluded from even bringing this claim. I think, Your Honor, and if I can clarify the answer I gave previously, the reason it's a question for the District Court, what I meant by that, is simply that the District Court is there seeing it firsthand. So in this particular case, the District Court received this testimony. It received the affidavits from the plaintiffs. It heard the testimony firsthand. And, importantly, in this case, Your Honor, and I think this is where it distinguishes from other inconsistent statements, the District Court gave multiple warnings to the plaintiffs and their counsel that he was observing statements that he believed were in complete contradiction to the testimony they had given at summary judgment. That goes to the intent issue, and I agree with you that's a relevant factor. But I'm not sure that answers the question that I have, which is, at what point does a prior inconsistent statement, what separates a regular prior inconsistent statement, which we all acknowledge is so well established that it's part of our rules of evidence, that you could use that in trial to impeach somebody and win your case, turns into this very different doctrine such that you win, do not pass code, do not collect your $200. I understand your point a little bit better there, Your Honor. I believe that that line comes in when the inconsistent statement is to further a legal position. So in the first instance, if they're taking a stance on the facts that furthers a certain legal position in one way, and then whether they prevail on that claim or not, they change that position. Let me give you an example of how this comes up. You could say social security cases. So, you know, someone seeks social security disability, and they get medical records, and you get the medical records, and the medical records say where the person tells their doctor, I'm feeling great, I did 10 jumping jacks today. And then when they get to the Social Security Administration, they say, you know, my back's really bad and I can't work. And what is done there is you impeach somebody, and you show their records to the judge, and the judge says, you know, they made an inconsistent statement, I don't believe them. The records show contemporaneous that there was no problem, therefore you lose. We generally don't say you can't bring a social security claim, you're done, goodbye, get out of here. I just, I'm having trouble understanding where that line is in a case like this. And that's really the argument your opposing counsel are making, which is this is really just a matter of trial and impeachment and inconsistent statements, not a matter of legal doctrine. I understand that point, Your Honor. But then if that position were accepted, then that would render essentially the judicial estoppel doctrine unusable. Well, no, because I think where you see it is where you use that to legal advantage in one sense, and then you then use it to legal advantage to the contrary. And that's where I think courts are saying this is really problematic. In other words, you can't go to a bankruptcy court and say, I have zero assets, please discharge all of my debt, get that debt, and then have an asset in your pocket, i.e., your really, really good lawsuit against your former employer, and then come and then say, I now want $100,000 of back pay for my, because I was discriminated against in my Title VII action. That you can't do because you were using the courts inconsistently. And I guess what my question is, where is the evidence of that here? Because that does seem to be the line at which the court then can exercise its discretion. Yes, Your Honor, and I would agree with that point. And that's exactly what the district court found. It found that it was, in fact, misled at the summary judgment stage. Now, plaintiffs didn't prevail, but that's not an element. Why is that not? That seems to be exactly the point. I mean, in other words, you won. Where was the estoppel? Where did they press an advantage to themselves from one thing and then press their advantage on the other? They lost on both sides of it. Two points. First is that this court has never held that the plaintiff or the party taking the inconsistent statement has to actually prevail. They have to mislead the court. No, that's true. I think the point of the, first of all, all of our cases are in the bankruptcy context. And in each of those, there is a discharge. In other words, there is some judicial remedy that you get as a result of your false statement or your original statement. And then you're seeking to use that false statement to your advantage later on. And I guess I'm having trouble seeing that in this context. I understand that the line is not as clear as perhaps in the bankruptcy proceedings. But the district court did believe that it had been misled at the summary judgment stage. It spent time and resources analyzing the issue under the arguments that plaintiffs advanced at that stage. And then the parties had to proceed again and trial. The defendants, for example, spent time and resources at trial. So in that sense, the district court did find that there was a misleading. That's prejudice to you, and that may be bad for you. I don't know that's prejudice to the court system at large. I believe the district court thought that it was. And, again, the district court was in the best position to view that analysis because it received that testimony firsthand. It watched the demeanor of the parties. It watched the demeanor of their counsel. And it determined in its discretion that this was the appropriate remedy in this context. And, again, that brings me back to the most important point for the judicial estoppel analysis, which is that plaintiffs have to show that this was an abuse of discretion, not merely that another court may have found a different way or on a different day this court may have ruled differently, but the district court abused its discretion. And we believe that's what's lacking here. The district court didn't make a rash decision. It heard this testimony. It warned the plaintiffs. It warned their counsel. They doubled down, presented that testimony further after we took a lunch break. And then, even then, the district court still gave the plaintiffs ample opportunity to respond to his concerns. Both parties were given the opportunity to brief the issues. Plaintiffs' counsel even hired their own counsel and submitted briefs on this issue. And after receiving all of the briefs, considering this testimony, the district court rendered a 28-page well-reasoned opinion. Our position is in those circumstances, under those facts, the district court didn't abuse its discretion. This court held in this later case that a district court abuses its discretion when it doesn't consider the totality of the facts and circumstances. And we believe here that the district court, as it set out in its lengthy opinion, did consider the totality of the facts and circumstances. And it went beyond just the testimony that the plaintiffs offered in their affidavits and at trial. It included misrepresentations that the court acknowledged and observed in the summary judgment briefing, playing fast and loose, as the court described it, with some of the evidentiary submissions that they made to the district court, as well as violating the district court's rules on briefing issues at the summary judgment stage. And so considering all of those, the totality of the circumstances, the district court determined in its discretion that this was the proper outcome. And so our position is that it should be affirmed on both grounds. And if there are no further questions, I'll return the rest of my time to the Court. Thank you. Thank you, Your Honor. Thank you. And you have two minutes on rebuttal. And I will do my best to go quickly here. Judge Berger, you mentioned the question about the straw that broke the camel's back. And indeed, that's exactly what the defendants testified to when they explained why they sent them home, because they sent them home in their brief, page 60, or page 50 of the brief, 60 in the filing. They say the undisputed evidence establishes Shea sent plaintiffs home because he thought Freddie and Chester took too long for lunch and Larry, their direct supervisor, failed to take control of the problem. So the lunch issue is there, but that was the straw that broke the camel's back. Well, what that means is under the Supreme Court precedent of barrage that interprets but for causation, that means that but for Larry or Chester and Freddie being late for lunch, they wouldn't have been sent home. So that is the controlling reason they were sent home. All the other stuff is in the background. Are you suggesting that if we have a situation where we have a pattern of declining work ethic and effort being put into a job and if the, you know, to quote Judge Berger, the straw that broke the camel's back is coming back late from lunch, that we're not supposed to look at what has led up to the? No, that takes us right to the issue that's not been discussed, which is the motivating factor standard. We've been all discussing McDonnell Douglas, but plaintiff pled in their complaint motivating factor. Defendants raised three affirmative defenses, saying 15, 16, and 18, saying, no, here's an affirmative defense, we would have reached the same decision anyway. The court never looked at motivating factor, ignored motivating factor, chose something else. So that's simply error. Time has expired. Two minutes goes very quickly. Thank you. And, Your Honors, I'll take the two minutes, but I think I went 30 seconds over last time. I want to address two questions that came up during the appellee's argument. The first goes to Judge Luck's question, which is, where is the line on estoppel where it goes between inconsistent statements and being part of the adversarial process and crosses into the ground of estoppel becomes appropriate? Judge Luck, there is an Eleventh Circuit case that goes outside of the bankruptcy context. While it does discuss bankruptcy, Smith v. Haynes & Haynes also addressed the context of judicial estoppel inconsistent positions taken by a plaintiff in that case. The plaintiff initially pled FLSA violations in the context to establish willfulness to take advantage of a three-year statute of limitations and pled facts that she had gone and complained to her employers about the way she was being paid and that that violated the FLSA. Hoisted by her own petard when that led to a summary judgment motion on her bankruptcy filings, she then moves to amend her complaint and takes out those allegations and affirmatively pleads that she did not know that there was a violation of the FLSA. In Judge Proctor's opinion, ultimately applying the doctrine of judicial estoppel, he said these inconsistent positions on the issue of willfulness also supported the application. On appeal, this Court reversed and remanded for the hearing that's anticipated by Slater to determine what the actual intent was behind it. But even in that case, this Court felt that those inconsistencies did not cross the line and that was in a pleading taking clear legal standards. And that's because those types of inconsistencies are part of the judicial process. But the appellee's point to that was that those inconsistencies are to further a legal position. As argued in our brief, Mr. Chester Coleman didn't have a position to further by the time he was testifying in the FLSA trial. And I'm out of my time, so thank you, Your Honors. Thank you. And Ms. Wilkinson, you have two minutes as well. Thank you, Your Honor. I want to go back to the topic of pretext. Dick Shea testified that Larry, Chester, and Freddie were eligible for rehire but for this lawsuit. If they were so bad in their performance, so lacking in their job duties late all the time, he would not have considered them eligible for rehire. He would have said, absolutely not. They are terminated and gone. But he went on to say— Right, but they were eligible for rehire. He would consider hiring these employees back that he now claims were so lacking and so bad they deserved termination. I think a jury can look at that and say, I think race was a factor. If you're going to put them back to work, anybody that's ever run a business would say, if you're tardy all the time, you're not coming back. I don't want you. But he's saying, you can come back. I might not put you in the same job, but come back and work for me. And when he went on to say, but for this, when this came up, meaning the lawsuit, I think you can infer race was a factor. I think he made that very clear. Or perhaps the lawsuit was the factor. Well, but the lawsuit is in part about race discrimination. Oh, he was clear, Counsel. He thought that your clients were lying, and he was offended by it. He said so. I can read the part of the transcript. No, no, no, he did, Your Honor. You are correct. That's why he said, I would not consider it now. But beforehand, I would have, but not at the same job and at a different salary, depending on the circumstances. Right? He did, Your Honor. No, you are correct. Absolutely, you are correct. I wanted to make one point about Lewis. I don't believe that this circuit has addressed Lewis with regard to pay claims at this point. I don't believe that there's a published opinion with regard to pay claims. And your time has expired. Thank you. Thank you all. We have your case under advisement. Okay. The third and final case of the day is Bruce Monroe. Bruce Monroe Limited versus Fairchild Tropical Botanic Garden, Inc., Night Garden, LLC. And the case number is 22-10450. Mr. Rothman, you have reserved five minutes for rebuttal. You may proceed when you are ready.